UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 10-20559 MC/DUBÉ

IN THE MATTER OF THE EXTRADITION
OF ROBERTO GUILLERMO BRAVO
_____/

## POST-HEARING MEMORANDUM IN OPPOSITION TO EXTRADITION

### I.
### PRELIMINARY STATEMENT

This Honorable Court held an extradition hearing on August 31, 2010. The Government had

presented documents from Argentina at the time the Complaint for Extradition was filed,[1] and later

filed, on June 28, 2010, a letter, dated March 17, 2010 from Judge Hugo Ricardo Sastre, the

presiding Federal Judge in the City of Rawson.[2] At the hearing, the Government announced that they

were relying on those documents.[3]

The Defense presented the testimony of two expert witnesses, Jon Perdue and Professor

Alfredo Solari, as well as sixteen documentary exhibits.[4]  It is important to note that the Government

stipulated to the qualifications of Mr Perdue and Professor Solari as experts,[5] and did not object to

---

[1]  The term "R." will be used to identify the pages from the English translation of the Argentina extradition documents. The term "Ex." will be used to identify the exhibits introduced into evidence by Bravo. The term  "Tr." will be used to identify the transcript of the Final Extradition Hearing.

[2]  *See* DE 31, Government's Memorandum On Political Offense Exception, Military Exoneration, And Amnesty, Exhibit A. The date appears on the Spanish document, but not on the English translation.

[3]  *See* Tr. 7.

[4]  *See* Exhibit List [DE 41].

[5]  *See* Tr. 10-11, 57.

Case No. 10-20559 MC/DUBÉ

the authenticity, relevance, or admissibility of any the documents we introduced into evidence.[6]

The testimony of Mr. Perdue and Professor Solari and the documents introduced in evidence through their testimony, have proved the two core defenses in these proceedings: (1) that the government has not met its burden to establish extraditability because the statements of the "survivors" are not credible and the defense evidence "obliterates" probable cause; and (2) that extradition is legally barred because the alleged crimes with which Mr. Bravo is charged constitute "political offenses" pursuant to the provisions of Article 4 of the Treaty.

## II.
## THE GOVERNMENT HAS FAILED TO ESTABLISH
## PROBABLE CAUSE FOR EXTRADITION

As we have argued in our Response To Government's Motion In Limine To Exclude Portions Of Bravo's Proffered Expert Testimony,[7] the Government's position that "[n]othing else is required and the information contained in the records submitted by the Government must be accepted as true by this Court" is simply wrong.[8] Rather, an extradition court's review "cannot be a mere ratification of the bare conclusions of others." *United States v. Nolan,* 651 F. Supp.2d 784, 810 (N.D. Ill. 2009) (*quoting In re Extradition of Ribaudo*, 2004 WL 213021, *5 (S.D.N.Y. Feb.3, 2004).

---

[6]  The Government did file a Motion In Limine To Exclude Portions Of Bravo's Proffered Expert Testimony [DE 35], which argued that Professor Solari should not be allowed to testify about the prior military acquittal or the amnesty, but they did not object to the documents about which he testified. The Motion in Limine was denied by the Court. *See* Tr. 7, DE 47.

[7]  *See* DE 39 at pp. 2-3.

[8]   *See* DE 35 at pp. 3-4.

2

Case No. 10-20559 MC/DUBÉ

Rather, the Court must conduct an independent and searching review of the evidence to determine whether probable cause exists[9] and whether materials submitted set forth "facts from which both the reliability of the source and probable cause can be inferred"[10]

In this regard, the Court has the full "authority and discretion" to determine the "credibility or reliability" of the Government's documents.[11] *See e.g., Escobedo v. United States,* 623 F. 2d 1098, 1102 n. 10 (5th Cir. 1980) (noting magistrate's role in assessing credibility); *Republic of France v. Moghadam,* 617 F. Supp. 777, 782-84 (D.C. Cal. 1985) (examining motives, facts and circumstances attendant to hearsay statement in extradition proceeding); *Shapiro v. Ferrandina,* 355 F. Supp. 563, 572 (S.D.N.Y. 1973) (noting that  improbability or vagueness of the testimony may destroy the probability of guilt ).

## A.     The Extradition Documents Rely on Statements That Lack Credibility and Reliability

While the extradition documents contain letters, findings, and orders by Judge Hugo Ricardo Sastre, the presiding Federal Judge in the City of Rawson, as well as relevant portions of the Argentinean Penal Code, the extradition request relies heavily on statements by three individuals who survived the shootings – Maria Antonia Berger, Ricardo Rene Haidar, and Alberto Camps – and an

---

[9]  *Extradition of Lehming*, 951 F.Supp. 505, 514 (D. Del. 1996); *Extradition of Platko*, 213 F.Supp.2d 1229, 1239-40 (S.D. Cal. 2002).

[10]  *See In Re Ben-Dak*, 2008 WL 1307816, at *6 (S.D. N.Y. 2008), *quoting In Re Ernst*,1998 WL 395267, at *9 (S.D.N.Y. 1998).

[11]  *See Gil v. Imundi,* 747 F. Supp. 1028, 1041 (S.D.N.Y. 1990) ("The magistrate does appear to have been mistaken to the extent he expressed on occasion the understanding that the extradition court lacked the authority and discretion to go beyond the face of the government's affidavits for purposes of determining credibility or reliability").

Case No. 10-20559 MC/DUBÉ

"inquiry statement" made by Carlos Amadeo Marandino, one of the military officers charged along with Bravo.

Judge Sastre makes reference to a "body of evidence," including "testimonies" from almost 50 witnesses, but none of those statements, or even summaries, have been provided, nor have their relationship to the Trelew shootings or their relevance to the case against Bravo been set forth. *See* R.40-41; R. 62-63.[12] There is reference to the testimony of Miguel Fernando Marileo, who "worked in a funeral parlor in Trelew" and "placed the dead bodies in the coffins" but no explanation of how or why his statement might prove that the shootings were the result of a planned "execution" rather than the consequence of yet another attempted prison escape, as the press reports and the official military investigation concluded.

The statements of Berger, Haidar, and Camps were obviously made shortly after the shootings at Trelew.[13] They have the very same captions,[14] and were described as "strikingly similar" by defense expert Jon Perdue (Tr. 52). It also appears that the statements were closely coordinated with a press conference given by their defense counsels.[15] In any event, the extradition documents recognize that

---

[12]  One of the names mentioned twice on the list of witnesses (R.41, 73), is easily recognizable: Eduardo Luis Duhalde, who had served as defense counsel for the terrorists in the early 1970s, became the Secretary of Human Rights in the Kirchner government, and was the Complainant who petitioned the court for the detention of Mr. Bravo. R. 3.

[13]  The Berger statement is dated September 5, 1972. The Haidar and Camps statements are not dated, but have the same captions and were likely made at the same time.

[14]  Each statement began with the caption "ACCOUNT BY SURVIVOR" followed by the name of the declarant. *See* R. 50 (Berger); R. 54 (Haidar); and R. 58 (Camps).

[15]  That press conference is listed as one of the folios of evidence, but is not included or summarized in the extradition documents. It is listed just before the "informal photocopies marked as testimony"of

4

Case No. 10-20559 MC/DUBÉ

all three "at present are missing in events subsequent to the event we give an account of." *See* R.2, 63. However, these unsworn statements[16] have inherent and serious problems of credibility and reliability.

First of all, the three were committed, vicious, and violent extremists and terrorists who had broken out of a maximum security prison at Rawson a week earlier, during which Mariano Pujadas – the same person who reportedly attempted to disarm Lt. Sosa at Trelew – shot and wounded a Rawson prison guard, followed by a killing shot – the "coup de grace" – fired by Ana María Villareal de Santucho.[17] Even the extradition documents confirm that the escaping terrorists shot two Rawson guards, killing one.[18] Thus, they were hardly the young idealists working for the benefit of Argentina, as suggested by the Government during cross-examination of Mr. Perdue and Professor Solari.[19]

---

the survivors. *See* R. 42, 63.

[16] The fact that the statements are unsworn does not alone make them unreliable. *See Oen Yin-Choy v. Robinson,* 858 F.2d 1400, 1405 (9th Cir.1988) (finding ten translated and unsworn witness statements to be competent on the basis of the authentication). However, it is appropriate and important to analyze their backgrounds, motives, and biases in order to determine whether their credibility and reliability are inherently suspect under all the circumstances.

[17]  *See La Razon* Newspaper Front Page, "Information Disclosed About The Events In Trelew" August 25, 1972 (Ex. 6). *See also* testimony of Jon Perdue, Tr. 40, 46, 53. Ironically, the Government seeks sympathy by pointing to the fact that she was 5 months pregnant when she was shot at Trelew, but her pregnancy did not interfere with her ability to gratuitously kill an already wounded prison guard in the head.

[18]  *See* Request for Inquiry statements and arrest of charged parties, dated January 31, 2008, at R. 35.

[19]  *See*, e.g., Tr. 32.

5

Case No. 10-20559 MC/DUBÉ

Rather, as Jon Perdue testified, they were committed to the doctrine "to kill innocents to get your cause noticed" (Tr. 48) and they were taught that "if incarcerated, escape, and escape and evasion is a part of their indoctrination as well." *See* R. 28:

Indeed, the respected newspaper La Nación recounted four separate escapes prior to the Rawson prison break, including the first on June 11, 1971, at the Women's Prison in the city of Córdoba, in which one of the escapees was the same (but not yet pregnant) Ana María Villareal de Santucho [20] Several of the escapes were described in the article as "bloody." In one, the accomplices to the escape launched hand grenades that they had brought in their briefcases, and a shoot-out followed in which four guards were injured, one seriously. In another, fourteen extremists and three common criminals escaped, and five prison guards died in the confrontation. *Id.*

It is also clear that the Montoneros and ERP terrorists regularly engaged in propaganda campaigns in order to gain recruits and public sympathy for their sustained campaign to overthrow the existing government. *See* Ex. 21, "The Montoneros: Armed Wing of Peronism;" Ex. 22, "Resolutions of the April 1971 Executive Committee Meeting - Party Propaganda and Education." Indeed, Ex. 22, in a section titled "Organizing Agitation and Propaganda," stated:

Organizing Agitation and Propaganda

> It is clear for anyone who approaches organizational problems from a Leninist standpoint that all these tasks we require of the Party and Army's agitation and propaganda work cannot fail to conflict unless we set up standing propaganda committees in all the regions, preferably with full time compañeros assigned to them.

> Up to now propaganda has been approached as a secondary, routine matter, something to be taken care of by some compañeros in the moments of spare time left

---

[20]  *See La Nación,* "Four Previous Terrorist Escapes," August 23, 1972,  Page 20 (Ex.. 6).

Case No. 10-20559 MC/DUBÉ

them by their mass work or military activities. We must realize that propaganda is as important as other tasks, and that the activists assigned to it will not be "wasted." Moreover, these teams will have their areas of mass and military work, as the National Propaganda Commission determines, but devote the lion's share of their activity to propaganda.

*See* Ex. 22, p. 3-4.  The document concluded with the following call to revolution:

On the basis of this common effort, to struggle to unite, within the Latin American process of revolutionary war, all the armed vanguard of the continent in building a common military force able to bring into reality the second Vietnam foreseen by Che, a struggle that would lead to the victory of socialism on this continent.

*Id*. at p. 10. The "Che," of course, was Che Guevera, and the goal was to overthrow the existing government in order to bring communism to Argentina.

It is therefore reasonable that the concerted and similar statements by the three survivors were designed to part and parcel of their propaganda – a planned and purposeful effort to demonize their military captors by lying about what occurred at Trelew, and attempting to paint them as murderers.[21]

Nevertheless, it is important to note that in his statement, Haidar unwittingly confirmed that the escape was not an excuse fabricated later, since he acknowledged that he heard Mr. Bravo state that there had been an attempted escape:

There was a prolonged silence.. then again **Bravo who very loudly was saying to someone: "they attempted to escape", "Pujadas attempted to snatch the pistol from Captain, attempted to resist".** Minutes later some one felt my pulse and commented: "This one has got quite a good pulse". Shortly after they put me on a stretcher and carried me to Base hospital. They covered my wound there and I was administered a tranquilizer.

*See* Statement of Haidar, R.56 (emphasis ours). Moreover, the fact that he was taken to the hospital

---

[21]   See Ex. 22, p. 1: "The Leninist definition, let's remember, was that propaganda is the art of teaching many ideas to a few and agitation is the art of teaching few ideas to many."

7

Case No. 10-20559 MC/DUBÉ

after finding that he had "a good pulse" is wholly inconsistent with the theory that this was a planned and cold-blooded execution.

All of the media reports regarding the events at Trelew, from the next days news in three Argentina newspapers (Ex. 6) to national and international news reports (Ex. 5), to extensive magazine reporting (Ex. 8), indicate that it is far more likely that there never was any planned execution, and that there had, indeed, been an attempt to overpower Lt. Sosa, take him hostage, and use him to negotiate or break their way out of the Trelew facilities.

Nor are the survivor's versions buttressed by the inquiry statement of Carlos Amadeo Marandino. Indeed, a fair reading of his inquiry answers makes it evident that he was not present when the shooting started and could not have been in a position to personally observe why it started and whether it was a planned execution or a reaction to an attempted escape. It is critical, however, that Marandino was in a position to **hear** what took place, and that what he heard contradicts the version portrayed in the extradition documents:

> After that it could be heard as if they spoke loudly or shouted. It also seemed as if it could be heard that they sang the (sixteenth folio) Argentinean anthem, after many shouts could be heard again. **Someone shouted they are trying to escape.** I heard many shots, there was a breathing space, and again the shots. After this I went in to see what was going on, they gave me a 0.45 mm pistol and that I had to check on bodies, which I did, took two or three steps and I went back because I feared something might happen to me, I feared for my life. I handed over my gun, feeling very nervous and confused, they took me to base infirmary and there I woke up in the very later hours that evening, I was given a tranquilizer to calm down. feared something might happen to me, I feared for my life. I handed over my gun, feeling very nervous and confused they took me to base infirmary and there I woke up in the very late hours that evening. I was given a tranquilizer for me to calm down

*See* R. 69. Marandino admitted that he was in "a state of shock" (R.71) seeing the bodies and felt "unwell." He also stated that he was only asked to check on the bodies later and was never ordered

8

Case No. 10-20559 MC/DUBÉ

to shoot anyone (R.73). While the Government makes much of his observation that one of more of the guards "smelled of alcohol and had "had drinks," he also stated clearly that they were not drunk and that they "walked properly, looked fine and expressed themselves correctly."(R.74).

All of these factors create skepticism and doubt regarding the credibility, reliability, and truthfulness of the accounts of the three survivors, upon which the extradition request relies, and create reasonable grounds to discount or disregard their statements.

It is also highly relevant and important to note that, since all three survivors died during the 1970s, there has never been – and will never be – any method to test their allegations or subject them to piercing analysis or cross-examination, and there is absolutely no independent evidence – at least none provided to this Honorable Court by Judge Sastre or Argentina in the extradition documents – that would support their version. It should, therefore, be of particular concern to this Honorable Court that there was absolutely no disclosure of the report of the full military investigation, nor was there any mention of the valid amnesty law which applied to the events at Trelew.

**B.**  **The Prior Military Acquittal and Amnesty Law 20,508 "Obliterate" Probable Cause for Extradition.**

A petitioner is permitted to introduce evidence that explains away or obliterates probable cause. *Mainero v. Gregg*, 164 F.3d 1199, 1205 (9th Cir. 1999), and evidence that tends to "obliterate" probable cause should be considered. *Shapiro v. Ferrandina*, 355 F. Supp. 563, 572 (S.D.N.Y.), aff'd, 478 F.2d 894 (2d Cir.), *cert.. dismissed*, 414 U.S. 884 (1973). Further, "When an individual seeks to present evidence that negates all bases for probable cause, such evidence must be admitted, because if the individual can successfully show the court that all bases for charging him are unreliable, then there is no evidence to support his extradition." *Maguna-Celaya v. Haro*, 19

9

Case No. 10-20559 MC/DUBÉ

F.Supp.2d 1337 (S.D. Fla. 1998). "Thus, it has been held appropriate to permit evidence that tends to obliterate probable cause ... " *In re Extradition of Mainero*, 990 F. Supp. 1208, 1218-19 (S.D.Cal. 1997) (emphasis ours).

In this case, Bravo introduced documentary evidence in the form of exhibits which were not objected to by the Government as to authenticity, that proved that a full military investigation had been conducted after the Trelew shootings, and that Bravo had been "acquitted" by that investigation and by a public Decree of the President of Argentina. Fair consideration of those documents leads to the inescapable conclusion – particularly in light of the failings of the survivors' statements – that they "obliterate" probable cause for extradition.

Professor Solari testified at the hearing that Article 29 of the Argentine Constitution, which was later incorporated into the Military Code of Justice, gave the military the exclusive jurisdiction to investigate and prosecute military officers. *See* Testimony of Alfredo Solari, Tr. 65-66.

Thus, following the events at Trelew, a **full military investigation was conducted** by a military Judge, who had the full benefit of the statements made by Berger, Haidar, and Camps.[22] The results of that investigation and the conclusions of the military Judge were then reviewed by high ranking military officials, and discussed in a Report by the General Auditor of the Armed Forces.[23]

---

[22]  Haidar, for example, wrote in his statement that Navy Justice official "pays me a visit in this hospital, to whom I give an account of the facts aforementioned." *See* R. 57. Likewise, Camps wrote that he was interviewed by a "Navy Judge" to whom he made his declaration and signed his statement. *See* R. 60.

[23] A properly authenticated copy of The Auditor General's Report was introduced into evidence by Bravo as Ex. 12. The Report confirms that "[w]hen the question of jurisdiction arose between the Federal Criminal Court of the Nation and the Military Investigative Judge that presides in these proceedings, the National Supreme Court determined that it corresponded to that member Court

Case No. 10-20559 MC/DUBÉ

The General Auditor concluded, based on "expert testimony on ballistics" and "expert testimony on the wounds," *Id.* at p. 4:

> ...that there is no convincing evidence, not even circumstantial evidence, which would allow criminal charges to be brought against the personnel who intervened in the suppression in order to prevent the escape and PUJADAS' rash behavior. In this sense, I agree with the opinion of the Investigative Judge, that the grounds for exemption from responsibility set out in Art. 34, paragraphs 4, 5, and 6 of the Criminal Code come into play here in relation to the military personnel's conduct.

*Id.* The Report also stated that the allegations made by the survivors – "that they had tried to kill them after the shootout had ended" – was completely disproved by the testimony of the medical and ballistic experts which "demonstrate their falseness" and that the military officers had "limited [their actions] to comply with their obligation of guarding these extremely dangerous subjects, acting appropriately." *Id.* Regarding the danger faced by the guards, the Report explained:

> On the other hand, I believe that the riot and the escape from Rawson Penitentiary, which had taken place only days before, by the extremist group that was later housed at the Naval Airbase, should certainly have been irrefutable proof of the operative capacity and danger of their members. It was therefore essential, in my understanding, faced with such history, to adopt exceptional security and custody measures in dealing with the detainees, and to act with necessary swiftness and vigor - as did occur - so that none of those measures would be too fragile or weak, in case the events repeated themselves, which would have inconceivable when it is the armed forces who should be acting.

The Report specifically addressed the role of Roberto Bravo in the second attack and attempted escape of the terrorists at Trelew:

> As far as Lieutenant BRAVO, I agree with what was stated in pgs. 406/407 by the Chairman of the Joint Chiefs of Staff who had determined that the previously named

---

[Military Court] to hear the events related to the attempted escape." *Id.* at p. 3.

11

Case No. 10-20559 MC/DUBÉ

officer should not be sanctioned. I should add that in my opinion BRAVO acted appropriately when faced with a very difficult circumstance in which he had to fulfill his task, as the leader of the guard responsible for guarding the fanatically dangerous detainees. It is evident that through his actions he not only saved the life of an officer, but also prevented the escape and the almost certain occurrence of other events with unforeseeable consequences. Simple routine compliance with the instructions he had received, to open fire immediately, would without a doubt have caused the death of Captain SOSA, given the way in which the events took place.

*Id.* at p. 5.  The Report finally concluded:

Given everything that was stated, and based on the facts and laws I have indicated, I believe that it is appropriate to resolve this case with a definitive acquittal, as provided by Art. 338, section 2 of the CNM.

*Id.*

The Defense first presented the General Auditor Report as Exhibit B to its Motion for Bail Pending Extradition Hearing [DE 11] which was filed on March 1, 2010. The Government quickly sought and received a "letter" (which does not appear to be sworn) from Judge Sastre to this Honorable Court, dated March 17, 2010, in which he discussed the Report and brazenly dismissed it as "a mere uncertified photocopy of an alleged report or opinion from a purported Armed Forces officer." [24]

Judge Sastre's characterization of the Report  was clearly misleading, since he knew that it was an official report of the Department of the Navy. Indeed, the very first page – a cover letter to the Minister of Defense – on the Report we secured demonstrates that **Judge Sastre had, himself, requested the file by letter of March 17, 2006, and it had been sent to him directly by the Chief of the Navy General Staff.**

---

[24]  The Sastre letter was filed with this Court on June 28, 2010, as an exhibit to its Memorandum On Political Offense Exception, Military Exoneration, And Amnesty [DE 31].

Case No. 10-20559 MC/DUBÉ

Thus, he clearly knew that it was an official document and not just an "alleged report" from a "purported Armed Forces officer." Such a misleading and dishonest opinion by Judge Sastre casts grave doubt on the remainder of his submissions, and it should not be tolerated by this Court. Judge Sastre was also entirely misleading when he stated in his letter that:

> . . . there is no file containing a final judgment evidencing that Roberto Guillermo Bravo has been tried for the crimes upon which his criminal prosecution by the Argentine State is based or, at least no such file has been found in the Argentine Ministry of Defence or the military officers under its command, or within the sphere of the Argentine Executive or Judiciary.

*Id.* We believe he knew, or should have known of the existence of Decree No. 425, which Professor Solari was able to get from the National Archives of Argentina, and which we introduced as Ex. 13.

In that document, President Lanusse, based on "information provided by the Chairman of the Joint Chiefs of Staff and the resolution of the Auditor General of the Armed Forces" found:

> That the exhaustive investigation completed, testimonial statements, medical reports, ballistic reports, expert testimony regarding wounds, etc., are insufficient to warrant judgment for reproach of any kind against the intervening military personnel, due to that fact that such examinations allow for the conclusion, beyond doubt, that they acted, facing an extremely dangerous group, in strict compliance with their orders, and in legitimate exercise of their authority

Ex. 13, at p. 1. Thus, the President of Argentina decreed:

> ARTICLE 1ST: To definitely **dismiss** the present preliminary proceeding under the terms of article 338, clause 2nd, of the Code of Military Justice (LM 14029)

> ARTICLE 2ND: To communicate this decree, present it to the National Bureau of Official Registry, record it and return it to the Commander in Chief of the Navy, for the pertinent purposes.

*Id.* at p. 2 (emphasis ours). Professor Solari testified that he secured the fully authenticated copy, saw the original document, and had it in his hands (Tr. 75). He also described the process involved in the

13

Case No. 10-20559 MC/DUBÉ

military investigation, a process in which the military Judge is required to marshal and review all the

evidence. Professor Solari also testified that the term "dismiss" has a special and significant meaning

in Argentine law:

> Q. Now, you were drawing a distinction between the use of the word dismissal on Exhibit 15 and its meaning in Argentina. Based upon constitutional law in Argentina and your expertise in that, is it the equivalent in Argentina of an acquittal?

> A. Absolutely. As a matter of fact, there's case law from the Supreme Court in Argentina that shows in this particular case when we're talking, what we're talking is when someone is absolved. And this is permanent in the sense that never again can there ever be a criminal case that is renewed based on the same facts.

Tr. 71-72. Later, he stated:

> Q. Let me ask you, because I got sidetracked, to just once again briefly explain what the impact is, the result of this decree number 425 with regard to Mr. Bravo's liability for any further prosecution.

> A. Once and for all in this particular case, it's a final and binding -- **it's final and binding that he is acquitted of any criminal consequences.** And according to article 335 of the military code of justice, **it is not allowable that there be a criminal prosecution once again done against him based on the same facts.**

Tr. 76-77 (emphasis ours).

The Government has argued that any evidence of Mr. Bravo's prior acquittal should not be

considered by the Court because it involves "a legal not a treaty defense to the charges" [*See* DE 35

at p. 6.] and the term "acquittal" is mentioned in Article 5 of the Treaty only in connection with an

acquittal in the Requested State, so an acquittal in the Requesting State has no force and effect. We

believe both arguments are entirely specious.[25]

---

[25]     At the extradition hearing, the Government argued that the Court should not address the issues regarding amnesty or the prior investigation and acquittal because they "are issues to be resolved by the Argentinean court." Tr. 4. The Court should reject this argument as well.

14

Case No. 10-20559 MC/DUBÉ

However, as we discussed in our Memorandum in Opposition to Extradition [DE 27], and reiterated in our Response To Government's Motion In Limine To Exclude Portions Of Bravo's Proffered Expert Testimony [DE 39], it is not necessary that this Honorable Court find that the prior acquittal provides an independent treaty basis for denial of extradition since evidence of Mr. Bravo's prior military exoneration and acquittal provides highly relevant evidence which "obliterates" probable cause for extradition.

The plain fact is that the Government has produced no evidence or testimony to overcome the plain reading of Decree No. 425 other than faulty and specious legal arguments. Decree No. 425, signed by the President of Argentina in full compliance with the Constitution and laws of that nation, as carefully and forcefully explained by Professor Solari, is more than sufficient to "obliterate" probable cause for extradition in this case.

But there is additional and important evidence for this argument. The impact of Amnesty Law 20,508 is important and admissible evidence which, standing alone or in concert with the military acquittal, also "obliterates" probable cause. That Amnesty law  was  passed by the Argentine Congress to apply to events prior to May 25, 1973, including the events at Trelew.[26] Professor Solari testified that this Amnesty Law has never been never been repealed or found to be unconstitutional, although two different laws had been declared void  (Tr. 42).

---

[26] A properly authenticated copy of the Amnesty law and an English translation was introduced into evidence by Bravo as Ex 14.

15

Case No. 10-20559 MC/DUBÉ

Professor Solari also testified that Amnesty Law 20,508 was invoked as recently as 2005 by then President Nestor Kirschner to restore the military rank and full back pay to a Navy Midshipman named Julio Caesar Urien, who had been convicted in 1972 of "mutiny with blood shed" for which he could have received the death penalty, but for the grant of amnesty under this law.[27]

The extradition documents themselves recognized that amnesty was a legitimate issue by setting forth the applicable provisions of the Argentinean Penal Code, including Section 59, which states that amnesty is one of three reasons why a "criminal action shall lapse."[28] Since that appears to the reason why Judge Sastre specifically mentioned that two different amnesty laws – No. 23.521 and No 23.492 – which were passed much later and covered other events, particularly those during the "Dirty War" which began in 1976, were abrogated by the Argentine Congress,[29] it is strange – indeed, suspicious – that he purposely avoided any discussion of the one Amnesty Law that **did** apply to Mr. Bravo and the events at Trelew.

---

[27] *See* Tr. 83-84. Professor Solari also identified and discussed Ex. 16, the official documentation of the application of Amnesty Law 20,508 to Midshipman Urien. *Id.*

[28] *See* R. 7: "SECTION 59; Criminal action shall lapse: 1* Because of charged party's death; **2\* Out of amnesty;** 3* Because of termination of actions by lapse of time; 4* Because of the aggravated party's waiver, in respect of offenses prosecuted only by an action brought by an individual." (emphasis added).

[29] *See* R - 11.

Case No. 10-20559 MC/DUBÉ

Whatever Judge Sastre's motives,[30] our documentary evidence and the strong and compelling

testimony of Professor Solari amply demonstrate that Amnesty Law 20,508 fully applies to him and,

thus, obliterates probable cause. It is no answer to argue, as the Government does, that he will be able

to raise those arguments at a trial in Argentina. As Judge James Lawrence King observed in an

extradition case:

> When all the evidence presented by the Government in an extradition proceeding is
> credibly tainted, thereby obliterating probable cause, the Court agrees with Petitioner
> that the burden should shift to the Government to come forward with independent
> evidence that the relator committed the crimes charged. Such a rule would protect the
> Court's preeminent duty to guard against due process violations and ensure that a
> relator is extradited only after an adequate showing of probable cause.

See *Maguna-Celaya v. Haro*, 19 F.Supp.2d 1337, 1344 (S.D. Fla.1998) *overruled on other grounds*,

172 F .3d 883 (11th Cir.1999).

This Court should not allow Mr. Bravo, a United States citizen, to be returned to a country

he left almost 40 years ago on the basis of credibly tainted evidence, when the evidence and testimony

produced by the Defense has effectively "obliterated" probable cause to justify extradition.

## III.
## EXTRADITION IS BARRED BY THE POLITICAL OFFENSE
## EXCEPTION TO THE TREATY

Even if this Honorable Court were to determine that the extradition documents establish

probable cause, extradition would still be barred under the treaty because the alleged offenses fall

under the "political offense" exception to the Treaty.

---

[30]   We recognize that, under the Treaty, any argument regarding political motivations for the
requested extradition of Mr. Bravo must be addressed to the Secretary of State, but we maintain that
this Court has the full discretion and authority to consider such motivation in analyzing and
determining the credibility and reliability of the evidence presented to establish probable cause.

17

Case No. 10-20559 MC/DUBÉ

Article 4 of the Extradition Treaty, "Political and Military Offenses," provides in Section 1 that "Extradition shall not be granted if the offense for which extradition is requested is a political offense." The Treaty does not define exactly what constitutes a "political offense," but does list certain offenses that "shall not be considered to be political offenses," none of which are applicable in this case.[31]

There are two types of political offenses: pure and relative. *Marzook v. Christopher*, 1996 WL 583378 (S.D.N.Y. 1996). ("'Pure' political offense are crimes directed at the state that lack the elements of ordinary crimes; they include such crimes as treason, sedition, and espionage"). In this case, there is no dispute that we are dealing with a "relative" political offense.

Courts have established a two-pronged test to determine whether an offense is sufficiently political under the relative political offense category to fall within the Treaty's extradition bar. In *Escobedo v United States*, 623 F.2d 1098, 1104 (5th Cir. 1980), the former Fifth Circuit defined "a political offense under extradition treaties as an offense committed in the course of and incidental to a violent political disturbance, such as war, revolution and rebellion." Another former Fifth Circuit case explained that political offense "must involve an `uprising' or some other violent political disturbance" and  that the "act in question must have been incidental to the occurrence in order to justify the exclusion." *Garcia-Guillern v. United States*, 450 F.2d 1189, 1192 (5th Cir.1971).[32] *See*

---

[31]  They include: attacks and crimes against Heads of State or their families; offenses covered by multilateral  international agreements on genocide, acts of terrorism, and narcotics trafficking which confer obligations to extradite; and attempts, conspiracies, or participation in such offenses. *See* Extradition Treaty, Article 4, Section 2.

[32]  Under *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Circuit is bound by cases decided by the former Fifth Circuit before October 1, 1981.

18

Case No. 10-20559 MC/DUBÉ

*also, Ordinola v. Hackman,* 478 F.3d 588, 596-97 (4th Cir. 2007); *Vo v. Benov,* 447 F.3d 1235, 1241 (9th Cir. 2006); *Eain v. Wilkes*, 641 F.2d 504, 518 (7th Cir. 1981); *Sindona v. Grant*, 619 F.2d 167, 173 (2d Cir. 1980).

Our previously filed Memoranda have discussed the law regarding application of the political offense in much greater detail, and we will attempt to repeat that analysis here.[33] We do, however, want to draw the attention of this Honorable Court to the fact that Mr. Bravo has fully carried his burden to demonstrate the applicability of the political offense exception, and that the Government has failed to meet their burden under the law.

A.   **Mr. Bravo Has Satisfied His Burden To Show That The Political Offense Exception Applies To Him In This Case.**

1.   **Standard of Proof**

This district in *Ramos v. Diaz*, 179 F. Supp. 459, 463 (S.D. Fla. 1959) articulated, in unequivocal terms, the burden of proof for raising the political offense exception defense to extradition:

> American authority indicates clearly that when evidence offered before the Court **tends to show** that the offenses charged against the accused are of a political character, **the burden rests upon the demanding government to prove to the contrary.**
>
> It is an essential part of the case for the demanding government that it be established not only that the crime charged is one of those enumerated in the treaty but also that it is an extraditable one.

---

[33] *See* Memorandum in Opposition to Extradition [DE 27]; Response To Government's Motion In Limine To Exclude Portions Of Bravo's Proffered Expert Testimony [DE 39]; Supplemental Response To Government's Motion In Limine Regarding Discussion Of Political Offense Exception [DE 40].

Case No. 10-20559 MC/DUBÉ

*Ramos, supra* at p. 463; *United States v. Pitawanakwat,* 120 F.Supp. 2d 921, 928 (D. Or. 2000),

*quoting Ramos* (holding that defendant had established the political offense exception and stating

that, "the initial burden of proof is on the defendant to establish the essential elements of the political

offense exception.

Once established, the burden shifts to the demanding Government 'to prove the crime charged

in the Complaint was not of a political character.' "); *In Re Singh,* 2005 WL 3030819 — at * 21

(E.D. Cal. Nov. 9, 2005) (No. 01-6215); *Arambasic v. Ashcroft,* 403 F.Supp. 2d. 951, 960 ((D. S.D.

2005),

*Ramos* also emphasized that, once the defendants offered unrebutted testimony showing that

their offenses were committed during a violent political uprising in Cuba and in furtherance of the

revolution between Fidel Castro and the Batista regime, the burden of proof shifted to the

Government to demonstrate that the offenses were not political:

> The Defendants offered testimony, which is unrebutted, that the Defendants were
> members of a revolutionary movement, that the crime allegedly committed by them
> took place in the early days of the victory of the revolutionary forces, and as a part
> of a political uprising and disturbance. The Defendants bore no ill will or malice
> toward their victim, who was just one of the many political prisoners captured in
> furtherance of the political rising. The Defendants were under the command of the
> revolutionary forces engaged in mopping up operations as a part of the revolution.
> These established facts placed the burden on the demanding government to prove that
> the crime charged in the Complaints was not of a political character**.** The demanding
> government failed to sustain this burden.

*Ramos*, at 463.

Applying this standard, the expert testimony of both Alfredo Solari and Jon Perdue more than

amply demonstrate that Mr. Bravo has satisfied the burden of proof for raising the political offense

exception. *Id*. at 463.

Case No. 10-20559 MC/DUBÉ

**2.      Expert testimony from Alfredo Solari and Jon Perdue demonstrated that a violent political disturbance was ongoing in Argentina when the incident at Trelew occurred.**

First, the testimony of both experts illustrates that Bravo's offense took place during a "violent political disturbance such as war, revolution, and rebellion." *Garcia Guillern v. United States*, 450 F. 2d 1189, 1191 (5th Cir. 1971); *Pajkanovic v. United States,* Fed. Appx. 1098, 1104 (11th Cir. Nov. 16, 2009) (No. 09-12510). For example, Professor Solari testified that during the early 1970s, leading up to the Rawson prison break, "**viciousness increased. It actually increased exponentially during that period of time.**" *See* Testimony of Alfredo Solari, Tr.  60 (emphasis ours). He also made it clear that "[t]he terrorists organizations were carrying out in this  particular case a revolution in order to go ahead and take over politically." *Id*. at p. 84. On direct examination, Mr. Perdue offered similar testimony:

Q. Tell us a little bit about the level of violence and the purpose of these terrorist organizations. First of all, were they terrorist organizations?

A. Yes, they would certainly classify themselves, I think, as that as well at the time.

Q. Was their purpose to overthrow the government of Argentina?

A. They overtly stated so at that time, yes.

Q. Were they involved in consistent uprisings and violence?

A. This was a sustained and continuous revolution that took place from the mid, I say late '50s through -- I think at least to the Mingrets [phonetic] in Argentina after the Dirty War started in 1976, within about a year, a year-and-a-half.

*See* Testimony of Jon Perdue, Tr. 13. Mr. Perdue continued:

Q. You said there were 17 armed insurgent groups operating in Argentina and then singled out the ERP and Montoneros?

Case No. 10-20559 MC/DUBÉ

A. As the most prolific.

Q. The most prolific and most violent?

A. Interchangeable to me.

*Id.* at p.16. And, after counsel asked Mr. Perdue to describe the level of violence, the way the

violence was increasing during 1970, 1971, and 1972, and whether or not there was a violent revolt

ongoing at the time that these Montoneros and ERP escaped from Rawson prison, Mr. Perdue

offered the following expert opinion:

> A. They had started in the late '60s and one in 1970. And **this was a sustained and
> systematic revolution, overtly stated**, and they -- in August, one year following the
> escape from Rawson prison, they formed, they even expanded and formed a --what
> was called the JCR, which was a Revolutionary Coordinating Committee in English,
> and that included what I mentioned from the southern cones, so they had -- **they were
> just getting started about 1972**, I would say.

*Id*. at p. 20, lines 7-20 (emphasis ours).

> **3.     The Expert Testimony Of Jon Perdue And Professor Alfredo Solari
>        Established That Mr. Bravo's Conduct at Trelew was Incident to and in
>        the Course of a Violent Political Disturbance**

Testimony from both experts also clearly showed that the shooting at Trelew was incidental

to and in the course of suppressing the Montoneros' violent terrorist revolution against the Argentine

Government. On this issue, Professor Solari testified:

> Q. Based on your expertise and having lived through it,  are you of the opinion that
> in 1970, 1971 and 1972 there was a violent political disturbance such as war,
> revolution or rebellion?
>
> A. The terrorist organizations were carrying out in this particular case a revolution in
> order to go ahead and take over politically.
>
> Q. And while they targeted civilians for reasons, including raising money to finance
> their operation, their major goal, their major target was the government; was it not?

22

Case No. 10-20559 MC/DUBÉ

A. Yes, that's right.

\* \* \* \*

Q. At the time of the prison break at Rawson, was that part of this ongoing revolution, ongoing violence, ongoing disturbance?

\* \* \* \*

Q. Rawson was the one I was talking about. There was a violent prison escape at Rawson?

A. Yes. This was an armed escape in which one of the prison guards was murdered, and this particular case his name was Juan Valenzuela, and there was another prison guard that was wounded.

Q. The Rawson prison break was in the course of this uprising?

A. It was part of the process of the Revolutionary Army.

Q. And it was not only in the course of these hostilities, the revolutionary terrorist attacks, but it was incidental to those terrorist attacks, it was an integral part of the violence?

MS. WOOD: Objection at this point. He's asking for him to make a legal conclusion.

MR. SONNETT: No, I'm asking for an expert opinion.

THE COURT: Overruled.

THE WITNESS: The revolutionary war is a political process that the guerrillas themselves have described, and among their actions there is a main one. In this particular case, they have to preserve their capacity to be combative or to fight. Consequently, the prisoners were obligated according to their commanders to escape from any prison in which they could be held. That's what they did in Rawson.

 BY MR. SONNETT:

**Q. In your expert opinion, then, Rawson was incident to these ongoing hostilities?**

**A. Absolutely.**

23

Case No. 10-20559 MC/DUBÉ

**Q. And as a continuation from Rawson to Trelew, Trelew was also during the course of and incident to the hostilities?**

**A. Absolutely.**

*Id*. at pp. 84 - 86. (emphasis ours).

Likewise, on direct examination, Mr. Perdue highlighted the direct connection between the prison break at Trelew and the armed revolution undertaken by The Montoneros:

Q. Let me then just ask you, Mr. Perdue, for a couple of conclusions based on your research and based on the work that you've done in this area. You've already stated that the terrorism activities were not limited to civilians but were primarily aimed at the government. Do you consider this to be an attempt, a sustained attempt of revolutionary overthrow of the government?

A. It was purely that.

Q. Were these Montoneros and ERP engaging in, and I'm quoting here from some case law, violent political disturbances such as war, revolution and rebellion?

A. Certainly.

Q. And were the events that took place in Trelew in the course of that violent disturbance, the ongoing disturbance?

A. Sure.

Q. And based upon your expertise, do you believe that the events that took place at Trelew were incident to that course of disturbance?

A. It is part of the process, I would say.

Q. I'm sorry?

A. It was part of the process, I would say yes. The answer is  certainly so.

Q. Right. So in your expert opinion you believe that it was incident to the violence that was taking place in the 1970s leading up to the escape at Rawson and the incident at Trelew?

24

Case No. 10-20559 MC/DUBÉ

A. And is doctrined as well to if incarcerated, escape, and escape and evasion is a part of their indoctrination as well.

Q. Is that based on your research of the Montoneros and the ERP?

A. As well as others.

*See* Testimony of Jon Perdue, Tr. 27. And, on re-direct examination, Mr. Perdue reiterated that:

A. Any time that there were incarcerated prisoners that I know of, there was a coordinated, and there was -- not only was there an attempt to free them, but this audacious act are part of their doctrine that they do to approve an escape attempt by a Montonero group, for instance, is far, far better as a public relations tool, so to speak, than a massive -- than killing the prisoner Fiat as they did, or that prison Imparanudo [phonetic] had done the year before.

*Id.* at p. 54.

In summary, both expert witnesses testified that the shootings at Trelew were in the course of and incident to a violent uprising – first at Rawson and then at Trelew – which were integral to the sustained and continuous armed revolution to overthrow the then-existing Argentine government. *See* Testimony of Alfredo Solari, Tr. 86 ("the prisoners were obligated to break out of any prison they were held."); *See* Testimony of Jon Perdue, Tr. 28 ("escape and escape and evasion is a part of their indoctrination").[34]

Complimenting the expert testimony, of course, were a large number of documents, in Exhibits 2, 4, 5, 6, 7, and 8, which further illustrated the nature of the ongoing revolutionary activities and more than satisfied the test for both prongs of the political offense test.

Based on both the documents and the expert testimony, it is clear that Mr. Bravo more than satisfied his burden of showing that his offense was a political offense. *Ramos*, *supra* at 463; *In Re*

---

[34] In fact, during this time period in Argentina, The Montoneros violence actually "increased exponentially." *See* Testimony of Alfredo Solari, at p. 60, 17-18.

25

Case No. 10-20559 MC/DUBÉ

*Ezeta,* 62 F.972 (N.D. Cal. 1894); *United States v. Pitawanakwat,* 120 F.Supp. 2d 921, 928 (D. Or. 2000).

**B.     The Government failed to submit any evidence to rebut Mr. Bravo's political offense theory**

As noted above, once Mr. Bravo offered evidence that "**tends to show** that the offenses charged against the accused are of a political character", the burden rests upon the demanding government to prove to the contrary. *Ramos, supra,* at 463 (emphasis ours); *United States v. Pitawanakwat,* 120 F.Supp. 2d 921, 928 (D. Or. 2000), ("the burden shifts to the demanding Government 'to prove the crime charged in the Complaint was not of a political character.' "); *In Re Singh,* 2005 WL 3030819 at *21 (E.D. Cal. 2005).

However, none of the documents submitted by Argentina addressed the political offense exception, and at the extradition hearing, the Government did not submit any additional evidence to contest the multitude of documents and the expert testimony of Jon Perdue and Alfredo Solari. Moreover, none of the cross-examination of Mr Perdue and Professor Solari by AUSA Wood refuted or even diminished their testimony on this issue.

According to the expert testimony, the prisoners belonged to the most violent subversive terrorist groups;[35] that to gain political power, those terrorists groups organized a sustained and systematic revolution, which included: kidnaping civilians, assassinating business executives and military officials, and premeditated, well orchestrated prison breaks from inside and outside prisons.[36]

---

[35]  *See* Testimony of Jon Perdue, R. 16; Testimony of Alfredo Solari, R.60-61, 84-85

[36]  *See* R. 60 - 61.

26

Case No. 10-20559 MC/DUBÉ

Both expert witnesses testified that the Rawson prison break – and many prison breaks resembling it – were an essential component of the terrorists training and indoctrination.[37] Trelew was simply a "continuation from Rawson" and another example of how these violent extremists waged their revolutionary war against the Government. *See* Testimony of Alfredo Solari, R. 86.

The Government did not in any way refute or contradict this testimony, and as such, they did not satisfy their shifting burden of showing that Mr. Bravo's offense was *not* a political offense under Article 4 of the Treaty.

Because the Government failed to submit evidence before or during the extradition hearing to refute Mr. Bravo's thorough demonstration – through pleadings, exhibits, and expert testimony – that his offense was in the course of and incidental to a violent political disturbance, this Court must deny Argentina's extradition request. *Ramos*, at 463.

### III.
### CONCLUSION

As we argued in our Response To Government's Motion In Limine To Exclude Portions Of Bravo's Proffered Expert Testimony [DE 39], this Honorable Court has wide latitude in receiving and considering evidence. Based on the testimony and evidence we presented, and the legal analysis we have submitted, it is clear that the Government has not met its burden of presenting credible, reliable evidence of probably cause to justify a Certificate of Extradition, and that, even if the credible evidence rose to the level of probable cause, extradition of Mr. Bravo is barred because the alleged offenses are "political offenses" within the clear language of the Treaty and the established case law.

---

[37] *See* R. 54.

27

Case No. 10-20559 MC/DUBÉ

Roberto Bravo has been a resident of the United States for almost 40 years, a United States citizen since 1987, and a highly respected and productive member of this community. The notion that he can be dragged back to Argentina to be incarcerated and held for trial for acts of bravery performed in the service of that country, based upon the propagandized statements of terrorists who have been dead for more than thirty years, simply flies in the face of due process and fundamental fairness.

Therefore, for all of the reasons discussed above and in our prior pleadings, and the testimony and evidence presented at the hearing in this case, this Honorable Court should conclude that Argentina has not met its burden to show sufficient probable cause, that extradition is barred under the political offense exception in the Treaty, and that extradition should be denied.

Respectfully submitted,

NEAL R. SONNETT, P.A.
Attorneys for Roberto Guillermo Bravo
Two South Biscayne Boulevard, Suite 2600
Miami, Florida  33131-1804
Telephone:    305-358-2000
Fax:          305-358-1233
Email:        nrs@sonnett.com


By   s/  Neal R. Sonnett
    **NEAL R. SONNETT**
    Florida Bar No. 105986

28

Case No. 10-20559 MC/DUBÉ

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2010, I electronically filed the foregoing document with

the Clerk of the Court and all counsel of record using CM/ECF.


By:  s/ Neal R. Sonnett
**NEAL R. SONNETT**

29