UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-20559-MC-DUBÉ

IN THE MATTER OF THE EXTRADITION
OF ROBERTO GUILLERMO BRAVO,

_____ /

## ORDER DENYING CERTIFICATION OF EXTRADITION

THIS CAUSE is before the Court on the Complaint for the Extradition of Roberto Guillermo

Bravo (hereinafter "Bravo") filed on February 23, 2010. (D.E. #1). For the reasons set forth herein,

the petition for Certification of Extradition is denied.

## I. FACTS

A.    Procedural History:

The extradition of Bravo is sought pursuant to an extradition treaty between the Government

of the United States and the Government of the Republic of Argentina (hereinafter "the Treaty").

The Treaty was signed on June 10, 1997, and entered into force on June 15, 2000. The offenses for

which the extradition of Bravo is sought are covered by Article 2 of the Treaty.

On February 25, 2010, Bravo was arrested pursuant to such request as the result of a

provisional warrant of arrest issued by this Court. (D.E. #2, #3). A bond hearing was held on March

2, 2010, and Bravo was released on bail pending a final extradition hearing. (D.E. #12). Thereafter,

and pursuant to the Treaty, Argentina submitted its formal request for the surrender of Bravo and

such request was supported by required and appropriate documentation submitted to the United

States Department of State. On August 17, 2010, such documents were filed with this Court. (D.E.

#38). A final extradition hearing was held before this Court on August 31, 2010, wherein Bravo,

his counsel, an Assistant United States Attorney acting on behalf of the Government of Argentina

and two expert witnesses were in attendance. (D.E. #42, #43).

Pursuant to the request of Argentina, the Government of the United States seeks the extradition of Bravo for the alleged offenses of 16 counts of murder and 3 counts of attempted murder which date back to August 22, 1972, when Bravo was a lieutenant in the Argentine Navy. The Complaint alleges that on August 22, 1972, Bravo and other military officers ordered 19 political prisoners to vacate the cells in which they were being detained at Almirante Zar Naval Base in the province of Chubut, in the city of Trelew in Argentina. The prisoners complied and within minutes, they were gunned down by Bravo and the other officers. Sixteen of the prisoners were killed and 3 survived.

Bravo, who came to the United States in 1973 and has been a United States Citizen since 1987, opposes extradition on several grounds. Specifically, Bravo argues that probable cause was not established because the extradition documents rely on statements that lack credibility and reliability; he has prior military acquittal for the alleged charges; and Amnesty Law 20.508 applies to the events for which he is being charged. Additionally, Bravo argues that extradition is barred by Article 4 of the Treaty between the United States and Argentina, which provides that extradition "shall not be granted if the offense for which extradition is requested is a political offense."

B.    The Government's Arguments:

The Government argues that the evidence provided by the Argentine authorities firmly establishes that there is probable cause to believe that Bravo committed the crimes alleged. In support of extradition, the Government submitted documents supplied by the Government of Argentina in both English and Spanish. Those documents include: (1) a letter from Judge Hugo Ricardo Sastre, the presiding Federal Judge in the City of Rawson (hereinafter "Judge Sastre"), as

2

well as relevant portions of the Argentinean Penal Code; (2) findings by Judge Sastre dated March

3, 2008; (3) the Request for the Detention and Amendment of Charges; (4) the Court's Order for

Bravo's arrest; (5) a Request for Inquiry Statements and Arrest of Charged Parties; (6) the Argentine

Criminal Code regarding Detention and Preliminary Examination; (7) a statement of Maria Antonia

Berger (hereinafter "Berger"), dated September 5, 1972; (8) an undated statement of Ricardo Rene

Haidar (hereinafter "Haidar"); (9) an undated statement of Alberto Camps (hereinafter "Camps");

and (10) the Inquiry Statement of Carlos Amadeo Marandino (hereinafter "Marandino"), who was

charged along with Bravo in the pending case in Argentina, dated February 20, 2008.

The Government also submitted a supplemental letter from Judge Sastre which addressed

Bravo's arguments regarding the prior military investigation and acquittal and the application of

Amnesty Law 20.508. (D.E. #31, Exhibit "A").  The Government notes that Judge Sastre's

supplemental letter asserts that no military tribunal has ever exonerated Bravo from his actions; and

that Amnesty Law 20.508 does not apply to Bravo's actions. (D.E. #31, pgs. 21, 25).

Additionally, the Government argues that the "political offense" exception does not apply

in this case because of Bravo's status and role as a government actor. In the Matter of the Requested

Extradition of Suarez-Mason, 694 F.Supp. 676 (N.D. Cal. 1988). (D.E. #31, pgs. 16-18).

C.      Final Extradition Hearing:

Under 18 U.S.C. § 3184, this Court held a hearing on August 31, 2010, to consider whether

the evidence of criminality presented by the Government of Argentina is "sufficient to sustain the

charge" for which extradition is sought. (D.E. #42).[1]

At the hearing, Bravo submitted numerous articles from a variety of Argentine, United States,

---

1. A transcript of the hearing is contained in the record. (D.E. #43).

3

and international publications of general circulation which established that during the early 1970's armed insurgent groups were actively operating in Argentina with the expressed purpose of overthrowing the military government then in power. The two largest and most dangerous of those terrorist groups were the Revolutionary Workers Party-People's Revolutionary Army ("ERP") and the Montoneros. The Montoneros, a left-wing Peronist group known for "violent urban terrorist actions such as political kidnappings and assassinations" and "dedicated to the overthrow of the government in Argentina,"[2] had begun to escalate their violent activities during 1970 through 1972. Many had been imprisoned during those years and had orchestrated a series of prison breaks and escapes.

Bravo's exhibits and expert testimony established that on August 15, 1972, a group of terrorists had been housed at the Rawson Federal Penitentiary, a maximum security prison, when a group of 25 orchestrated a violent but successful prison break, taking control of the prison, stealing weapons, killing a prison guard and escaping from the Penitentiary with the assistance of accomplices on the outside.[3]

Six of the leaders of the group traveled by car to the Trelew Airport, where they boarded a commercial airplane with 96 passengers which had already been hijacked by 3 accomplices who had been onboard. They fled to Chile and were then given safe passage to Cuba. The remaining 19 escapees, who were unable to get to the Trelew Airport in time to board the departing hijacked plane, took over the airport, holding captives in a standoff with Marine forces, until they negotiated their

---

2. See http://www.britannica.com/EBchecked/topic/391049/Montonero.

3. The Argentina Newspaper La Nacion recounted four separate escapes prior to the Rawson prison break, several of which were described as "bloody" in which guns and hand grenades were used in shoot-outs which resulted in the wounding or killing of almost a dozen guards. See La Nacion, "Four Previous Terrorist Escapes," August 23, 1972, Page 20 (D.E. #41, Exhibit 6).

4

surrender and were housed at the Admiral Zar Naval Airbase in Trelew.  According to reports in the Argentina newspaper La Opinion, all 19 were extremists who were members of the major terrorist groups. (D.E. #41, Exhibit 6).

On August 22, 1972, there was a shooting at the Trelew facility where thirteen prisoners died on the scene, three died later at the hospital and three survived (the survivors were: Berger, Haidar and Camps).

According to Bravo's documents, including news reports and the official investigation by a military Judge[4], one of the guards had heard whispering and suspicious noises coming from the cells, and decided to order the detainees to come out of their cells, place their blankets and mats in the hall in front of the cells, and line up against the wall, facing the entrance, for inspection.  At that point, Luis Emilio Sosa (hereinafter "Sosa"), a Marine Corps Corvette Captain, proceeded to walk down the line of prisoners and was attacked from behind by Mario Pujadas (hereinafter "Pujadas"), one of the prisoners.  At that point, the officers, including Bravo, began to fire in self-defense.

Additionally, Bravo presented testimony by expert witnesses, Jon Perdue, Director of Latin America Programs at The Fund for American Studies in Washington, DC (hereinafter "Perdue")[5] and Alfredo Solari, an Argentine Constitutional Law Professor (hereinafter "Professor Solari"). (D.E. #41, Exhibits 1, 3).

Professor Solari testified at the hearing that Article 29 of the Argentine Constitution, which was later incorporated into the Military Code of Justice, gave the military the exclusive jurisdiction to investigate and prosecute military officers.  Professor Solari further testified that a full military

---

4. The summary of the military investigation is contained in a report of the Auditor General of the Armed Forces which was introduced by Bravo. (D.E. #41, Exhibit 12).

5. Perdue's testimony will be incorporated in the Legal Analysis portion of this Order.

investigation was conducted regarding the events at Trelew, as directed by the Supreme Court of

Argentina. (D.E. #43, pgs. 65-66). Bravo was cleared by that military investigation. The report of

the Auditor General concluded as follows:

> As far as Lieutenant BRAVO, I agree with what was stated in pgs. 406/407 by the Chairman of the Joint Chiefs of Staff who had determined that the previously names officer should not be sanctioned. I should add that in my opinion BRAVO acted appropriately when faced with a very difficult circumstance in which he had to fulfill his task, as the leader of the guard responsible for guarding the fanatically dangerous detainees. It is evident that through his actions he not only saved the life of an officer, but also prevented the escape and the almost certain occurrence of other events with unforeseeable consequences. Simple routine compliance with the instructions he had received, to open fire immediately, would without a doubt have caused the death of Captain SOSA, given the way in which the events took place.
>
> ...
>
> Given everything that was stated, and based on the facts and laws I have indicated, I believe that it is appropriate to resolve this case with a definitive acquittal, as provided by Art. 338, section 2 of the CNM.

(D.E. #41, Exhibit 12, pg. 6).

Professor Solari explained that, under the then existing law, the recommendation of the

Auditor General was transmitted to the Joint Chiefs of the Nation and then to the President of

Argentina, who issued Decree No. 425, based on "information provided by the Chairman of the Joint

Chiefs of Staff and the resolution of the Auditor General of the Armed Forces" which that the

evidence was "insufficient to warrant judgment for reproach of any kind against the intervening

military personnel" and decreed to "definitely dismiss the present preliminary proceeding." (D.E.

#41, Exhibit 13).

Furthermore, Professor Solari testified that, under Argentina law, the Decree was:

6

> ... final and binding – it's final and binding that he is acquitted of any
> criminal consequences. And according to article 335 of the military
> code of justice, it is not allowable that there be a criminal prosecution
> once again done against him based on the same facts.

(D.E. #43, pg. 77).

Of concern to this Court, is the fact the extradition documents contain no mention of the

military investigation and "acquittal" of Bravo, nor do they mention the Amnesty law passed in 1973

which is still in full force and effect, and fully protects Bravo from prosecution in this case.

This Court, however, will address the issue of whether probable cause exists to extradite

Bravo, and whether the "political offense" exception to the Treaty bars the extradition of Bravo.

## II. LEGAL ANALYSIS

An extradition treaty creates in a foreign government the right to demand and obtain

extradition of an accused criminal. Quinn v. Robinson, 783 F.2d 776, 782 (9th Cir.), cert. denied,

479 U.S. 882 (1986). Absent a treaty, the federal government lacks the authority to turn the accused

over to the foreign government. Id. The Court is cognizant of its obligation to approach "challenges

to extradition with a view toward finding the offense within the treaty." McElvy v. Civiletti, 523

F.Supp. 42, 48 (S.D. Fla. 1981). Moreover, extradition treaties are to be liberally construed so as

to effect their purpose, that is, to surrender fugitives for trial for their alleged offenses. Valentine v.

United States ex rel. Neidecker, 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936); Factor v.

Laubenheimer, 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315 (1933); McElvy 523 F.Supp. at 47.

This Court must determine whether the evidence provided by Argentina in support of its

application for extradition is "sufficient to sustain the charge under the provisions of the proper

treaty or convention." 18 U.S.C. § 3184. In the instant cause, in order for the extradition of Bravo

to be proper, the government has the burden of establishing the following four elements: (1) that

there are criminal charges pending against Bravo in Argentina; (2) that the crimes with which Bravo is charged are extraditable offenses under the treaty; (3) that Bravo is the individual actually sought by the authorities in Argentina; and (4) that, based on the papers submitted by the government, there is probable cause to believe that a crime was committed and that Bravo committed it. United States v. Barr, 619 F.Supp. 1068, 1070 (E.D. Pa. 1985).

In making these determinations, the credibility and weight of the evidence are exclusively within the discretion of the Magistrate Judge. Noel v. United States, 12 F.Supp.2d 1300, 1303 (M.D. Fla. 1998) (citing United States v. Wiebe, 733 F.2d 549, 553 (8th Cir. 1984)); Garcia-Guillern v. United States, 450 F.2d 1189, 1192 (5th Cir. 1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972). "The extradition hearing is not a trial on the merits to determine guilt or innocence, but serves as a means of ensuring that probable cause exists to believe the person whose surrender is sought has committed the crime for which his extradition is requested." Castro Bobadilla v. Reno, 826 F.Supp. 1428, 1433 (S.D. Fla. 1993), aff'd, 28 F.3d 116 (11th Cir. 1994).

The probable cause standard applicable in extradition proceedings is defined in accordance with federal law. Id. (citing Sindona v. Grant, 619 F.2d 167, 175 (2d Cir. 1980)); Barr, 619 F.Supp. at 1071). Under federal law, probable cause exists where there is "knowledge of reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." United States v. Howard, 489 F.3d 484, 491 (2d Cir. 2007) (citing Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006)), cert. denied, 128 S.Ct. 525 (2007). Likewise, evidence that tends to "obliterate" probable cause should be considered. Shapiro v. Ferrandina, 355 F.Supp. 563, 572 (S.D. N.Y.), aff'd, 478 F.2d 894 (2d Cir.), cert. dismissed, 414 U.S. 884 (1973). Additionally, if "an individual seeks to present evidence that

negates all bases for probable cause, such evidence must be admitted, because if the individual can successfully show the court that all bases for charging him are unreliable, then there is no evidence to support his extradition." Maguna-Celaya v. Haro, 19 F.Supp.2d 1337 (S.D. Fla. 1998).

Therefore, it is "appropriate to permit evidence that tends to obliterate probable cause...." In re Extradition of Mainero, 990 F.Supp. 1208, 1218-19 (S.D. Cal. 1997). If the evidence presented does not amount to probable cause and "the requesting state's allegations are nothing more than suspicious... the request must be denied." United States v. Fernandez-Morris, 99 F.Supp.2d 1358, 1366 (S.D. Fla. 1999).

The admissibility of evidence in extradition proceedings is governed by 18 U.S.C. § 3190, which provides as follows:

> Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.

18 U.S.C. § 3190.

Accordingly, hearsay evidence is admissible. Simmons v. Braun, 627 F.2d 635, 636 (2d Cir. 1980); accord Hoxha v. Levi, 465 F.3d 554, 561 (3d Cir. 2006); United States v. Pena-Bencosme, 2006 WL 3290361, at *2 (E.D. N.Y. Nov. 13, 2006) (citing cases). Additionally, the court may even rely on "unsworn statements of absent witnesses." Collins v. Loisel, 259 U.S. 309, 316 (1922); accord Simmons, 627 F.2d at 636. However, this does not mean that the hearing court should act as a "rubber stamp." Pena-Bencosme, 2006 WL 3290361, at *2 (quoting United States v. Fernandez-

9

Morris, 99 F.Supp.2d 1358, 1366 n. 7 (S.D. Fla. 1999)). Rather, "a court must conduct an independent assessment of the evidence and closely examine the requesting country's submissions to ensure that any hearsay bears sufficient indicia of reliability to establish probable cause." Pena-Bencosme, 2006 WL 3290361, at *2 (citing Gill v. Imundi, 747 F.Supp. 1028, 1041 (S.D. N.Y. 1990)).

Bravo does not dispute that there are criminal charges pending against him in Argentina; that the crimes with which he is charged are extraditable ones under the Treaty; and that he is the individual actually sought by Argentina. Bravo argues that the extradition documents submitted by the Government are not sufficient to provide probable cause that the crimes charged have been committed, or that he committed them, particularly in light of his defense evidence of prior military acquittal and grant of Amnesty. Bravo further argues that his extradition is barred by the "political offense" exception contained in Article 4 of the Treaty.

A.     Probable Cause for Extradition:

    1.     Credibility and Reliability of the Survivors' Statements:

The extradition request relies heavily on the unsworn statements made by Berger, Haidar and Camps in September 1972; and the Inquiry Statement of Marandino on February 2008. This Court has carefully reviewed these documents and finds inherent and serious problems of credibility and reliability with them.

First, this Court will address the statements of Berger, Haidar and Camps which claimed they were victims of a "massacre" and the soldiers ordered them out of their cells, lined them up, and with no provocation, opened fire in a mass execution. Additionally, the statements made by Berger, Haidar and Camps assert harsh treatment during the week prior to the shootings, including requiring

some prisoners to lay on the ground naked, despite frigid weather. (R. 38, 51, 55, 59). They claimed Bravo participated in some of the harsh treatment of them.  On the night of the shootings, they claim Bravo and other officers entered the cell area, directed Marandino to open the cells and leave the area; and then the officers began firing their machine guns at the prisoners. (R. 51-52, 55, 59, 69-70).

The statements of Berger, Haidar and Camps appear to have been made shortly after the shootings at Trelew and in concert with one another and with their defense counsels. (R. 50, 54, 58). While only the Berger statement is dated, it appears that all three statements were given around the same time since all three statements have the same captions and were described as "strikingly similar" by Perdue. (D.E. #43, pg. 52).  It appears that the statements were coordinated with a press conference given by their defense counsels. (R. 42, 63).  The statements and the press conferences by the defense lawyers are relevant to the determination of credibility and motive, because Bravo submitted documents which support his position that "terrorists regularly engaged in propaganda campaigns in order to gain recruits and public sympathy for their sustained campaign to overthrow the existing government." (D.E. #57, p. 6).

The fact that the survivors' statements were not made under oath or in any official forum does not disqualify the statements from consideration since, as noted above, even unsworn statements can support probable cause.  However, the Court believes such statements require a more in depth inquiry of the circumstances under which they were given and the backgrounds, motives and biases of the declarants, in order to determine whether the statements are inherently suspect and thus lack the credibility and reliability to support a finding of probable cause. Republic of France v. Moghadam, 617 F.Supp. 777, 782-84 (D.C. Cal. 1985).

This Court notes that there has been no dispute that the three survivors were committed

11

members of extremist and terrorist groups that had broken out of a maximum security prison at Rawson a week earlier, during which two Rawson guards were shot, resulting in the death of one guard. (D.E. #41, Exhibit 6; D.E. #43, pgs. 40, 46, 53; R. 34-35). In fact, as Perdue testified, Berger, Haidar and Camps were committed to the doctrine "to kill innocents to get your cause noticed," and they were taught that "if incarcerated, escape... and evasion is a part of their indoctrination as well." (D.E. #43, pgs. 28, 48).

Ironically, parts of the statements provided in the extradition documents actually support the defense theory, and thus, diminish the level of probable cause. For example, Haidar acknowledged in his statement that he heard Bravo state that there had been an attempted escape. Specifically, Haidar stated as follows:

> There was a prolonged silence, then again Bravo who very loudly was saying to someone: "they attempted to escape", "Pujadas attempted to snatch the pistol from Captain, attempted to resist". Minutes later some one felt my pulse and commented: "This one has got quite a good pulse". Shortly after they put me on a stretcher and carried me to Base hospital.  They covered my wound there and I was administered a tranquilizer.  I was able to see the other injured ones: Astudillo, Kohon, Maria Antoni, Polti and Camps. (fifth folio) In the course of Tuesday morning I am transferred together with Camps to Port Belgrano Hospital, I am operated on there around 21:00.

(R. 56). This Court notes that the fact that Haidar was taken to the hospital after finding that he had "a good pulse" and was "operated on" are inconsistent with the theory that this was a planned and cold-blooded execution, since committed executioners would hardly decide to leave survivors.

Next, this Court will address the Inquiry Statement of Marandino.  It is evident from a fair reading of Marandino's answers that he was not present in the room when the shooting started and could not have been in a position to personally observe why it started and whether it was a planned execution or a reaction to an attempted escape.  However, Marandino was able to hear what took

place, and what he heard further erodes probable cause to believe that the events at Trelew were a planned "massacre" or execution. Specifically, Marandino stated, in pertinent part, as follows:

> After that it could be heard as if they spoke loudly or shouted. It also seemed as if it could be heard that they sang the (sixteenth folio) Argentinean anthem, after many shouts could be heard again. Someone shouted they are trying to escape. I heard many shots, there was a breathing space, and again the shots. After this I went in to see what was going on, they gave me a 0.45 mm pistol and that I had to check on bodies, which I did, took two or three steps and I went back because I feared something might happen to me, I feared for my life. I handed over my gun, feeling very nervous and confused, they took me to base infirmary and there I woke up in the very later hours that evening, I was given a tranquilizer to calm down....

(R. 69).

Marandino admitted that he was in "a state of shock" seeing the bodies and hearing the gun shots, and was taken to the infirmary. (R. 71). He also stated that he was only asked to check on the bodies later and was never ordered to shoot anyone. (R. 73).

While the Government notes his observation that one or more of the guards "smelled of alcohol"and had "had some drinks," he also stated clearly that they were not drunk and that they "walked properly, looked fine and expressed themselves correctly." (R. 74). Given the fact that he was not present when the shooting began, his so-called "recantation" that he did not think it was believable that the prisoners were trying to escape has little or no probative value.

All of the above factors add to the Court's skepticism and doubt regarding the credibility, reliability, and truthfulness of the accounts of Berger, Haidar and Camps, upon which the extradition request relies, and create reasonable grounds to discount or disregard their statements.

It is also of concern to this Court that Berger, Haidar and Camps disappeared or died during the 1970's. (R. 2, 63). Thus, there has never been any way to test their allegations or subject them

to any cross-examination. Moreover, the extradition documents do not reveal any independent evidence that would support their version.

This Court agrees with the observations of Perdue during cross-examination that the difference between the versions of the three survivors and the official military investigation turned on whether the shooting started because of a "fusilado, as they call it, where you line them up against the wall and open fire. Or a response to a disarming one of the guards and trying to foster another escape." (Tr. 37).

Perdue's observation is important because the extradition documents contain no mention of the official military investigation and the fact that the military Judge in charge of the investigation had interviewed Haidar and Camp, had the benefit of their statements, and made specific findings that their versions of the events were not credible based on independent evidence. (D.E. #41, Exhibit 12, pg. 4).

　　2.　　Evidence of the Military Acquittal and Grant of Amnesty:

According to the Government, Article 5 of the Treaty only bars extradition based on double jeopardy when the person has been tried and acquitted in the Requested State (i.e. the United States), and since Bravo has not been acquitted in the United States, he may not invoke that section as a defense to extradition. In re Extradition of Hurtado, 622 F.Supp.2d 1354, 1356 (S.D. Fla 2009). However, Hurtado does not apply in this case as Bravo has not invoked Article 5 of the Treaty, but rather asserts that evidence of a prior acquittal is an issue "which obliterates probable cause." (D.E. #27, pgs. 20-21).

As previously noted, Professor Solari testified at the hearing that Article 29 of the Argentine Constitution, which was later incorporated into the Military Code of Justice, gave the military the

14

exclusive jurisdiction to investigate and prosecute military officers. (D.E. #43, pgs 65-66). Professor Solari established, and the properly authenticated documents confirmed, that the required full military investigation was conducted by a military Judge, reviewed by high ranking military officials, and summarized in a Report by the Auditor General of the Armed Forces that recommended a "definitive acquittal." (D.E. #41, Exhibit 12, pg. 6).

Those recommendations ultimately were reviewed by President Lanusse, who signed Decree No. 425 based on "information provided by the Chairman of the Joint Chiefs of Staff and the resolution of the Auditor General of the Armed Forces" and found as follows:

> That the exhaustive investigation completed, testimonial statements, medical reports, ballistic reports, expert testimony regarding wounds, etc., are insufficient to warrant judgment for reproach of any kind against the intervening military personnel, due to that fact that such examinations allow for the conclusion, beyond doubt, that they acted, facing an extremely dangerous group, in strict compliance with their orders, and in legitimate exercise of their authority.

> That neither does any accusation arise within the scope of discipline, taking into account that, as stated previously, the actions of the personnel that suppressed the escape intent and motivated by the special circumstances under which the group of prisoners had been placed in their custody, the danger the prisoners posed and the intent to prevent their escape with unforeseen consequences[.]

(D.E. #41, Exhibit 13, pg.1).

Therefore, the President of Argentina, under the authority of the Code of Military Justice, decreed as follows:

> ARTICLE 1st: To definitely dismiss the present preliminary proceeding under the terms of article 338, clause 2nd, of the Code of Military Justice (LM 14029).

> ARTICLE 2nd: To communicate this decree, present it to the National Bureau of Official Registry, record it and return it to the Commander in Chief of the Navy, for the pertinent purposes.

(D.E. #41, Exhibit 13, pg. 2).

Additionally, the evidence and testimony regarding Amnesty Law 20.508 is equally important and admissible evidence which, standing alone or in concert with the proof of military acquittal, also obliterates probable cause. Amnesty Law 20.508 was passed by the Argentine Congress to apply to events prior to May 25, 1973, including the events at Trelew. (D.E. #41, Exhibit 14). Professor Solari testified that this Amnesty Law has never been repealed or found to be unconstitutional, although 2 different laws had been declared void. (R. 82). Professor Solari also testified that Amnesty Law 20.508 was invoked as recently as 2005 by then President Nestor Kirchner to restore military rank and full back pay to a Navy Midshipman who had been convicted in 1972 of "mutiny with blood shed" for which he could have received the death penalty, but for the grant of amnesty under this law. (Tr. 82-84; D.E. #41, Exhibit 16).

According to Section 59 of the Argentinean Penal Code, amnesty is one of three reasons why a "criminal action shall lapse." (R. 7). Although this Court will not speculate as to Judge Sastre's reasoning or logic for not mentioning Amnesty Law 20.508 in his letter to the Court. This Court does call into question why Judge Sastre specifically mentioned Amnesty Law 23.521 and Amnesty Law 23.492, which covered later events and were abrogated by the Argentine Congress, but does not mention Amnesty Law 20.508 which applies to Bravo's case and has never been abrogated. (R. 11).

Furthermore, Judge Sastre submitted a supplemental letter, dated March 17, 2010, in which he attempted to downplay the effect and impact of the Auditor General's Report, which he characterized as "a mere uncertified photocopy of an alleged report or opinion from a purported Armed Forces officer." (D.E. #31, Exhibit A, pgs. 3-4). Whether intentional or not, this was clearly

16

misleading, since the cover letter to the Defense exhibit revealed that it had been provided to him by the Department of the Navy in response to a request he made in March 2006. His statement that "there is no file containing a final judgment" was also incorrect or misleading, since, as Professor Solari explained, the Presidential Decree No. 425 was such a final judgment, and Judge Sastre knew, or should have known, of its existence. (D.E. #31, Exhibit A, pg. 4).

This Court concludes that the evidence of the full military investigation and acquittal, Presidential Decree No. 425, and the evidence and testimony regarding the application of Amnesty Law 20.508 are all relevant and admissible on the issue of probable cause. Furthermore, the Court finds that the relevant evidence does obliterate the showing of probable cause in this case. Therefore, based on that finding, the Government of Argentina has failed to carry its burden of showing probable cause to justify extradition.

B.    The "Political Offense" Exception to the Treaty:

Although this Court has found that the Government has failed to establish probable cause for extradition, it will nevertheless address the "political offense" exception.

Article 4 of the Treaty, "Political and Military Offenses," provides in Section 1 that "Extradition shall not be granted if the offense for which extradition is requested is a political offense." The Treaty does not define exactly what constitutes a "political offense," but does list certain offenses that "shall not be considered to be political offenses," none of which are applicable in this case.

There are two types of political offenses: "pure" and "relative." Marzook v. Christopher, 1996 WL 583378 (S.D. N.Y. 1996). "Pure" political offenses are crimes directed at the state that lack the elements of ordinary crimes, which include crimes as treason, sedition, and espionage.

"Relative" political offenses are crimes that are (1) "incidental to," (2) the occurrence of "severe political disturbances, such as war, revolution and rebellion." Id.  In the present case, we are dealing with a "relative" political offense. Id.

The courts have established a two-pronged test to determine whether an offense is sufficiently political under the relative political offense category to fall with the Treaty's extradition bar.  To meet the test, the defendant must establish that the political offense "involve[d] an 'uprising' or some other violent political disturbance" and that the "act in question must have been incidental to the occurrence in order to justify the exclusion." Garcia-Guillern v. United States, 450 F.2d 1189, 1192 (5th Cir. 1971).  To constitute an "uprising" under the first prong of the test, there must be "substantial revolt  and widespread violence" and not merely "sporadic acts of violence." Ahmad v. Wigen, 726 F. Supp. 389, 408 (E.D. N.Y. 1989), aff'd, 910 F.2d 1063 (2d Cir. 1990); Eain v. Wilkes, supra at 519-520.

The initial burden of proof is on the defendant to establish the essential elements of the political offense exception.  If the defendant establishes the essential elements, then the burden shifts to the government to prove the crime charged in the complaint is not of political character. Ramos v. Diaz, 179 F. Supp. 459, 463 (S.D. Fla 1959); United States v. Pitawanakwat, 120 F. Supp.2d 921, 928 (D. Or. 2000).

1.      The "Uprising" Prong:

To satisfy this prong of the political offense exception, a petitioner must show that an "uprising" or some other violent political disturbance such as an insurrection, a rebellion, or a war occurring at the time the offense was committed. Barapind v. Enomoto, 400 F.3d 744, 753 (9th Cir. 2005); Quinn v. Robinson, 783 F.2d 776 (9th Cir. 1986).

18

In the present case, the evidence submitted by Bravo regarding the activities of the ERP and the Montoneros during 1970 to 1972 and the expert testimonies from Perdue and Professor Solari amply demonstrated the existence of rebellion, insurrection, or war, and proved that the Trelew incident took place during a "violent political disturbance such as war, revolution, and rebellion." (D.E. #41, Exhibits 4-8; R. 10-14, 57-59); Garcia Guillern v. United States, 450 F.2d 1189, 1191 (5th Cir. 1971); Pajkanovic v. United States, Fed. Appx. 1098, 1104 (11th Cir. Nov. 16, 2009) (No. 09-12510). For example, Professor Solari testified that during the early 1970s, leading up to the Rawson prison break, "viciousness increased. It actually increased exponentially during that period of time." (D.E. #43, pg. 60). Additionally, he made it clear that "[t]he terrorists organizations were carrying out in this particular case a revolution in order to go ahead and take over politically. (D.E. #43, pg. 84). Perdue offered similar testimony (D.E. #43, pgs. 13, 16, 20).

    2.    The "Incidence" Prong:

Likewise, the evidence and testimony clearly established that the shooting at Trelew was incident to, and in the course of, suppressing the violent terrorist revolution against the Argentine Government.

Professor Solari testified that the Rawson prison break was "absolutely" incident to the ongoing hostilities, and the Trelew incident was also "absolutely" during the course of the incident to the hostilities. (D.E. #43, pg. 86). Perdue also testified that the events that took place in Trelew were in the course of the ongoing violent disturbance, and that the events that took place at Trelew were incident to that course of disturbance. (D.E. #43, pgs. 27-28).

Both expert witnesses also strongly agreed that the Rawson prison break and the shootings at Trelew were in the course of, and incident to, the violent uprising integral to the sustained and

continuous armed revolution to overthrow the then-existing Argentine government.  Specifically, Professor Solari testified that "the prisoners were obligated according to their commanders to escape from any prison in which they could be held. " (D.E. #43, pg. 86).  Additionally, according to Perdue's expert opinion, the prisoners were trained that "if incarcerated, escape, and escape and evasion is a part of their indoctrination." (D.E. #43, pg. 28).

Based on the documents and the expert testimonies, this Court finds that Bravo satisfied his burden of showing that the charges against him constituted a political offense. Ramos, supra at 463; In Re Ezeta, 62 F. 972 (N.D. Cal. 1894); United States v. Pitawanakwat, 120 F. Supp.2d 921, 928 (D. Or. 2000).

3.    The Burden Shifts to the Government:

The testimony and evidence introduced by Bravo was compelling and far exceeded his threshold burden of presenting evidence that "tends to show" that the offenses were of a political character.  At said point, "the burden rests upon the demanding government to prove to the contrary." Ramos v. Diaz, supra at 463.

The Government, however, did not in any way refute or contradict Bravo's evidence, and therefore failed to satisfy their shifting burden of showing that Bravo's offense was not a political offense under Article 4 of the Treaty.  This Court finds that the Government failed to submit evidence before or during the extradition hearing to refute Bravo's pleadings, exhibits and expert testimony that his offense was in the course of, and incidental to, a violent political disturbance. Therefore, this Court finds that the political offense exception applies to Bravo and his extradition is barred by Article 4 of the Treaty.

### III. <u>CONCLUSION</u>

Based on the foregoing, this Court finds that the Government has not met its burden to establish extraditability because the statements of Berger, Haidar and Camps are not credible and the defense evidence has "obliterated" probable cause; and the extradition is legally barred because the alleged crimes with which Bravo is charged constitute "political offenses" pursuant to the provisions of Article 4 of the Treaty.

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

(1)     The request for extradition is **DENIED** and this Court will **NOT** issue a Certificate of Extradition to the Secretary of State recommending that Roberto Guillermo Bravo be extradited to Argentina;

(2)     The bonds and conditions of release previously ordered by the Court (D.E. #14, 15) are hereby **DISCHARGED**, the Clerk of Court shall release all funds held in the registry of the Court, and the personal sureties and guarantors of the bonds posted in this cause are hereby relieved of all further obligations in this cause.

(3)     All travel documents and passports surrendered to Pretrial Services or the Government shall be promptly returned to Bravo.

(4)     This case is **CLOSED** and any pending motions are **DEEMED** as **MOOT**.

**DONE AND ORDERED** this ⟋⟍ day of November, 2010.


ROBERT L. DUBÉ
UNITED STATES MAGISTRATE JUDGE